1  ROBERT J. ROSATI, No. 112006
   robert@erisalg.com
2  THORNTON DAVIDSON, No. 166487
   thornton@erisalg.com
3  ERISA Law Group LLP
   6485 North Palm Avenue, Ste. 105
4  Fresno, California 93704
   Telephone: 559-478-4119
5  Telefax: 559-478-5939

6  Attorneys for Plaintiff,
   DEBBIE WELHOELTER

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| DEBBIE WELHOELTER, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **BREACH OF CONTRACT**<br>2. **INSURANCE BAD FAITH**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiff, Debbie Welhoelter ("Plaintiff"), alleges as follows:

**JURISDICTION**

1. Jurisdiction in this Court is proper in this action pursuant to the provisions of 28 U.S.C. § 1332 because, as more fully appears below, the amount in controversy exceeds the value or sum of $75,000.00 and the parties are citizens of different states.

///

///

COMPLAINT
1

**VENUE**

2. Venue is proper in the Eastern District of California in that Plaintiff is and was a resident of Rocklin, in Placer County, California, when Defendant terminated Plaintiff's long term disability benefits ("LTD") and breached its contract and other obligations to Plaintiff.

**INTRADISTRICT ASSIGNMENT**

3. Pursuant to Civil Local Rule 120(d), this civil action, which arose in Placer County, is properly assigned to the Sacramento Division.

**PARTIES**

4. Plaintiff Welhoelter is, and all times mentioned herein, was a citizen of the State of California and a resident of Rocklin, County of Placer, State of California.

5. Defendant, The Prudential Insurance Of America ("PRUDENTIAL") is a corporation organized under the laws of the State of New Jersey with its principal place of business (home office) and its administrative office in Newark, New Jersey, and is authorized to transact insurance, and is and was transacting insurance, in the State of California at all times mentioned herein.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

6. Prudential issued Group Contract Number PVIB-03 ("The Policy") to The PruValue Insurance Benefits Trust ("The Trust").

7. The Trust was established by Prudential for the purpose of marketing insurance products and services to others. Employers who join The Trust are not part of a bonafide association of employers tied by a common economic or representational interest unrelated to the provision of benefits. Employers who join The Trust do not exercise control, either directly or indirectly, either in form or in substance, over the insurance plan. Therefore, the insurance plan is not subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

8. Effective July 1, 2010, the City of Rocklin joined The Trust and thereby obtained coverage for long-term disability ("LTD") benefits under Group Contract No. PVIB-03 for specified employees of the City of Rocklin, including Plaintiff.

9. Rocklin, is a governmental entity organized and operating under the laws of the State of California. As such, its benefit plan is a "governmental plan" as that term is defined by ERISA §3(32), 29 U.S.C. § 1002(32) and therefore not subject to ERISA, 29 U.S.C. § 1001 et seq.

10. Plaintiff was an employee of the City of Rocklin and a beneficiary of The Policy because she was an employee of the City of Rocklin.

11. The Policy provides in pertinent part:

A. "You are disabled when Prudential determines that:

* you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury***; and

* you are under the ***regular care*** of a ***doctor***; and

* you have a 20% or more loss in your ***monthly earnings*** due to that sickness or injury.

B. After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

* you are unable to perform the duties of ***any gainful occupation*** for which you are reasonably fitted by education, training or experience; and

* you are under the regular care of a doctor."

C. Material and substantial duties is defined as:

"Duties that:

* are normally required for the performance of your regular occupation; and

* cannot be reasonably omitted or modified."

D. Regular occupation is defined as:

"The occupation you are routinely performing when you disability begins. Prudential will look at your occupation as it is normally

performed instead f how the work tasks are performed for a specific employer or at a specific location."

E. Gainful occupation is defined as:

"An occupation, including self employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:

* 80% of your *indexed monthly earnings*, if you are working; or

* 50% of your monthly earnings if you are not working."

F. Benefits are potentially payable to a Claimant's normal Social Security retirement age, which for Welhoelter is age 67.

G. Benefits are payable after a 90-day elimination period.

12. The Policy provides that if the claim is denied, the claimant is entitled upon request to copies of all documents, records, and information, relevant to her claim and to submit an appeal for a full review and further permits a second, voluntary appeal if the first appeal is denied.

13. The Policy's definitions of "disabled," as alleged in Paragraph 11, are superceded by California law. Notwithstanding the specific language of The Policy, as alleged in Paragraph 11, California law requires an insurance company to consider: (a) whether the claimant could reasonably be expected to work; recognizing the fact that the insured may do some work or even the fact that he or she may be physically able to do so is not conclusive evidence that his or her disability is not total, if reasonable care and prudence require that he or she desist; (b) given the claimant's physical and/or mental capacity; (c) and his or her station in life; (d) to perform the "substantial and material" duties of his or her own occupation; (e) with "reasonable continuity"; and (f) in the usual and customary way. Recovery is not precluded because the claimant is able to perform sporadic tasks or attend to simple, inconsequential details incident to the conduct of business. When evaluating a claimant's capacity to perform "any occupation" the insurance company must take into account the claimant's age, education, experience, training, and station

in life. Thus, an uneducated laborer cannot be expected to become an accountant or banker and a doctor, lawyer, or business executive is totally disabled even if he could run a news stand or work as a day laborer.

14. The Policy provides for a maximum LTD benefits period to normal Social Security Retirement age for employees, such as Plaintiff, whose disability begins at age 60 or younger, which for Plaintiff is age 67.

15. Plaintiff became disabled in October 22, 2012, due to fibromyalgia, chronic fatigue, arthritis, hypothyroidism, hypertension, and obesity.

16. Plaintiff has the following symptoms: chronic, severe pain, chronic fatigue; and depression.

17. Welhoelter and her physician explained that she had numerous, recurrent absences from work due to her conditions.

18. Due to her numerous, recurrent absences Welhoelter's employer, The City of Rocklin, ordered her to submit to a fitness-for-duty evaluation.

19. On May 3, 2012, Occu-med informed Welhoelter it had been asked to assist in determining her ability to perform the essential functions of her job. It requested that Welhoelter submit specific questions to Dr. Kramer for his response. It noted,

> "You have missed work intermittently and without advanced notice since 2006 as a result of what has been described by you as 'Chronic Fatigue and Fibromyalgia.' Your physicians have indicated that these conditions date back as far as the year 2004 and were originally anticipated to resolve within one year. Despite the initial prediction that your conditions would resolve within one year, you have required intermittent and upredictable time off work each year between 2006 and present. Your time off work as a result of these medical conditions has been document as follows on the next page."

20. In its May 3, 2012, Fitness-For-Duty Evaluation, letter Occu-Med listed Welhoelter's time off work due to her conditions by the month. Though each month varied, there was a clear increase in time off in 2010 forward. By year, from 2006 forward, Welhoelter's average monthly absences due to her condition were as follows:

  2006: 11.08 hours/month

2007: 3.70 hours/month

2008: 6.9 hours/month

2009: 8.15 hours/month

2010: 18.35 hours/month

2011: 48.85 hours/month

2012: 35.5 hours/month (this is for January and February 2012 only).

21. By letter dated July 2, 2012, Occu-med wrote to the City of Rocklin's City Attorney regarding Welhoelter's fitness-for-duty evaluation. It stated, in part:

> "Occu-Med, on behalf of the City of Rocklin (hereafter, the 'City'), evaluated the appropriateness of allowing the City's employee, Debbie Welhoelter, to continue to perform the essential functions of the Office Assistant II job class at either full or modified duty."
>
> * * * *
>
> "Ms. Welhoelter obtained responses from her treating physician, Paul Kramer, M.D., to specific questions posed regarding her ability to safely, consistently and appropriately perform the essential functions of the Office Assistant II job class. In those responses, Dr. Kramer indicated that Ms. Welhoelter is presently unable to appropriately and consistently perform the essential functions of the Office Assistant II job class <u>without restriction</u>. However, Dr. Kramer was able to identify work restrictions and accommodations that would permit Ms. Welhoelter to perform the essential functions of the Office Assistant II job class at a modified capacity. Specifically, Dr. Kramer indicated that Ms. Welhoelter should be restricted to a 32-hour workweek. Further, as a result of the chronic, intermittent symptoms of Ms. Welhoelter's medical condition, it is predicted that the consistency of her working hours would be similar to that experieced in the past few years. (Note: Ms. Welhoelter's ability to attend work over the past few years has fluctuated, but in each year she required significant, unpredictable time off as a result of her medical condition.) When Dr. Kramer was asked to clarify the probable duration of Ms. Welhoelter's need for intermittent and unpredictable time off work, he responded that the symptoms have been stable for years and are unlikely to change in the near future. Accordingly, Dr. Kramer goes on to reiterate that Ms. Welhoelter is expected to continue to require time off work intermittently."
>
> ". . . . Despite Dr. Kramer's indication that Ms. Welhoelter could perform the essential functions of her job safely, he clearly expresses his determination that she will be unable to do so consistently (may only work 32 hours per week and will continue to require unpredictable and intermittent time off work)."
>
> * * * *
>
> "The City has carefully considered its ability to accommodate Ms. Welhoelter's specific work restrictions (outlined herein) and has

determined to do so would constitute an undue hardship for the City (for the reasons outlined in the enclosed 'City of Rocklin Memorandum: Debbie Wolhoeter – Impacts to Department Due to Intermittent Leave') and, therefore, are not reasonable to accommodate. In light of this, Occu-Med recommends that Ms. Welhoelter be Medically Disqualified from the Office Assistant II job class."

22. The City of Rocklin decided it could not accommodate Welhoelter due to her absences caused by her medical condition.

23. Therefore, the City of Rocklin terminated Welhoelter's employment. Welhoelter's last day of work was October 19, 2012; her first day absent was October 22, 2012. Her elimination period ended January 20, 2013. Welhoelter applied for LTD benefits from Prudential.

24. By letter dated January 23, 2013, Defendant denied Plaintiff's claim for LTD benefits.

25. Pursuant to the terms of The Policy, by letter dated July 17, 2012, Plaintiff requested review of the termination of her LTD benefit. Her request for review consisted of her attorney's 60 page letter, her sworn declaration, updated medical records, Occu-Med's letters, her job description, and medical articles and medication side effects articles. Therein, she explained that: her recurrent absences are overwhelming evidence of disability; Prudential failed to consider California standards of any occupation; Prudential failed to consider pain as a disabling condition; Prudential failed to consider fatigue as a disabling condition; Prudential failed to realistically consider side effects of medication as a disabling condition; Prudential failed to consider mental clouding as a disabling condition; Prudential failed to consider obesity as a disabling condition; Prudential improperly considered only "objective" medical evidence. Prudential has a history of mishandling fibromyalgia and chronic fatigue claims; Prudential failed to address Welhoelter's treating doctors opinions; Prudential failed to have Welhoelter examined by a doctor; and the Welhoelter is disabled and entitled to benefits under the policy and suggests additional testing Prudential could undertake if it so chose.

26. By letter dated October 14, 2013, Prudential refused to alter its conclusion terminating Plaintiff's LTD benefits.

27. Plaintiff is, and at all times relevant hereto, has been and continues to be totally

disabled under the terms of The Policy, as written and as properly construed under California law.

28. The Policy was in full force and effect when Plaintiff became totally disabled.

29. Plaintiff has performed all conditions on her part to be performed under the terms of The Policy.

30. Defendant Prudential breached its obligations under The Policy to Welhoelter by failing and refusing to pay LTD benefits to her. Furthermore, Prudential's January 23, 2013, and October 4, 2013, letters constitute an express repudiation and anticipatory breach of Prudential's future obligations to pay LTD benefits to Welhoelter under The Policy, thus making all such obligations now due and owing.

31. As a result of Defendant Prudential's breach of The Policy, Plaintiff has suffered damages. Specifically, there is, under the terms of The Policy, now due and owing to Plaintiff from Defendant:

    A. The sum of $2,589.38, for past due benefits from January 21, 2013, to October 20, 2013;

    B. The sum of $130,367.22, for future benefits from October 21, 2013, until Plaintiff attains the age of 67;

    C. Totaling $132,956.60, plus 10% interest on past due benefits.

### SECOND CLAIM FOR RELIEF

**(Insurance Bad Faith)**

32. Plaintiff incorporates by reference paragraphs 1 through 31 of this Complaint.

33. By virtue of The Policy there is and was an implied by law covenant of good faith and fair dealing which required Defendant to deal in good faith and fairly with Plaintiff in handling her claims, refrain from doing anything to injure Plaintiff's right to receive the benefits of the Policy, and which required Defendant to give at least as much consideration to Plaintiff's interests as it gave to its own interests.

34. Notwithstanding Defendant's knowledge of its obligations to pay Plaintiff's LTD benefits under The Policy, Defendant has failed and refused to do so.

35. Defendant unreasonably and in bad faith withheld and refused to pay Plaintiff LTD benefits due her under The Policy. Defendant's unreasonable and bad faith conduct included, but was not limited to the following:

    A. Defendant denied Plaintiff's LTD benefits claim arbitrarily and without proper cause.

    B. Defendant dishonestly selected experts whom it knew to be unreasonable and who would be unfair in evaluating Plaintiff's claim.

    C. Defendant unreasonably failed to conduct a thorough investigation of Plaintiff's claim.

    D. Defendant failed to investigate Plaintiff's claim objectively.

    E. Defendant used improper standards to deny Plaintiff's claim.

    F. Defendant unreasonably interpreted the language of The Policy.

    G. Defendant failed to investigate the new evidence Plaintiff submitted as part of her request for review in an objective and reasonable manner and refused to reevaluate Plaintiff's claim despite overwhelming evidence that its initial decision was wrong. As alleged in Paragraph 25, above, Welhoelter submitted a comprehensive request for review of the initial decision denying her benefits. Yet, Prudential's October 4, 2013, letter addresses virtually none of the arguments and considered virtually none of the evidence Welhoelter submitted. Prudential simply "went through the motions" and denied Welhoelter's claim for review and demonstrated it never intended to honestly or fairly consider her claim.

36. Defendant, as a matter of custom and practice, unreasonably and in bad faith withholds or terminates policy benefits due to its insureds, and did so with regard to Welhoelter's claim. Defendant's unreasonable and bad faith conduct also includes, but is not limited to, the following:

    A. Knowingly misrepresenting to claimants pertinent facts relating to coverage or policy provisions.

      B.      Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies.

      C.      Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims in which liability has become increasingly clear.

      D.      Compelling insureds to institute litigation to recover amounts due under insurance policies.

37. Prudential, as a matter of custom and practice, also engages in the following unfair and bad faith claims practices, and did so with regard to Welhoelter's claim:

      A.      Failing to obtain medical and other records and evidence needed for the decision.

      B.      Failing to fairly interpret or imply information from the claimant's attending physician.

      C.      Failing to obtain independent medical examinations, or functional capacity evaluations, or cardiopulmonary exercise testing ("CPET") in appropriate circumstances.

      D.      In claims involving multiple conditions or co-morbid conditions, failing to evaluate the totality of the claimant's medical condition.

      E.      Placing an inappropriate burden upon claimants to justify eligibility for benefits and denying claims because the claimant failing to provide "objective evidence" of a disabling condition even though the Policy does not require that the claimant provide such evidence.

38. Here, Prudential also additionally acted in bad faith as follows:

      A.      Prudential's conclusion that Plaintiff is and was not disabled, was based on clearly erroneous findings of fact: there is simply no supporting evidence for that conclusion. The evidence presented to Prudential established that Plaintiff is and was totally disabled and is and was entitled to benefits under The Policy.

      B.      Prudential ignored Plaintiff's functional limitations.

|   |   |   |
|---|---|---|
| C. | Prudential disregarded Plaintiff's history of medical treatment and the opinions of her doctors. |
| D. | Prudential disregarded the findings and conclusions of the City of Rocklin's fitness-for-duty evaluation. |
| E. | Prudential failed to have Welhoelter examined by a physician. The Policy provides it with the authority to have a claimant examined. Instead of conducting a fair or reasonable investigation, Prudential simply selectively considered limited information in order to justify a pre-determined and unjustified conclusion to terminate benefits. |
| F. | Prudential failed to reasonably consider pain as a disabling condition. |
| G. | Prudential failed to reasonably consider fatigue as a disabling condition. |
| H. | Prudential failed to reasonably consider the side effects of the medications Welhoelter takes and the effects those medications have on her and her ability to function, much less to work in a full time capacity. |

39. Prudential further acted in bad faith in that, as a matter of custom and practice and in regards to all or most pain-based disabilities, especially chronic fatigue syndrome ("CFS") and fibromyalgia based disabilities, Prudential:

A. Improperly tries to pigeon-hole disabling symptoms and conditions as caused by a mental illness in order to invoke Prudential's 24-month mental illness benefits limitation.

B. Isolates symptoms to avoid paying claims.

C. Searches for reasons in the records it obtains to deny benefits and disregards reasons in the records it obtains which support awarding benefits or continuation benefits.

D. Repeatedly hires doctors to review claims or examine claimants who routinely find that the claimants are not disabled or that their disabilities are subject to limitations and provide those doctors financial incentives to continue to do so.

E. Routinely reject the opinions of doctors they hire when those doctors conclude

that the claimant's condition supports disability benefits.

F.  Routinely hires doctors who do not believe that anyone can be disabled by CFS and/or fibromyalgia and/or other chronic pain and fatigue conditions.

G.  When the doctors Prudential initially hire to evaluate a claimant and the claimant's condition conclude that the claimant is disabled and entitled to benefits, Prudential routinely reassesses and reconsiders the claimant's status and finds other doctors to render opinions that the claimant is not disabled or otherwise not entitled to benefits.

H.  Continuously asserts new or different reasons to deny or terminate benefits and demands new or different testing which could have been requested earlier, after benefits have been denied or terminated and during the pendency of administrative appeal.

I.  Denies such claims on the premise of the claimant could work previously.

J.  Denies such claims on the premise that the condition does not prevent the claimant from working.

K.  Denies such claims on the premise that such claims they cannot be confirmed scientifically, and/or the evidence relied upon is subjective and/or demand objective evidence to prove the existence of such conditions, not merely the extent of the disability.

L.  Relies upon negative findings of objective testing to conclude the claimant is not disabled even though negative findings of objective testing are inherent to the diagnoses of such conditions.

M.  Ignores or fails to obtain available objective evidence of disability such as FCEs and CPETs.

N.  Disregards that, as to such conditions, mental illness is often a sequelae of a physical condition, not the cause of the physical condition.

40.  As a direct and proximate result of Defendant's unreasonable failure to pay benefits, Plaintiff has been denied LTD benefits in an amount totaling $132,956.60, plus interest

at 10% on past due benefits.

41. As a further direct and proximate result of Defendant's wrongful conduct as herein alleged, Plaintiff sustained emotional and mental distress and anguish, embarrassment, and other general damages in an amount reasonably valued at $5,000,000.00.

42. As a further direct and proximate result of Defendant's unreasonable and bad faith failure to provide Policy benefits, Plaintiff was required to retain the services of counsel and suffered damages measured by the reasonable value of attorney's fees incurred obtaining Policy benefits.

43. In unreasonably refusing to provide benefits Prudential engaged in trickery, deceit, concealment, and misrepresentation of facts, as more fully alleged in Paragraphs 35-39, inclusive of this complaint.

44. Prudential further engaged in trickery, deceit, concealment and misrepresentation of facts by falsely representing to Welhoelter that it would independently and honestly review her contractual internal appeal when it had no intention of doing so and failed and refused to do so.

45. In committing the acts described in this Complaint, Prudential acted in conscious disregard of the rights of Plaintiff and is guilty of malice, oppression and fraud as more fully alleged in Paragraphs 34-44, inclusive, herein. The conduct of Defendant warrants an award of punitive and exemplary damages in an amount appropriate to punish Defendant and deter it and others from engaging in similar wrongful conduct.

**THIRD CLAIM FOR RELIEF**
**(Intentional Infliction of Emotional Distress)**

46. Plaintiff incorporates by reference paragraphs 1 through 45 of this Complaint.

47. Defendant's conduct, as alleged herein, was extreme and outrageous.

48. Defendant intended to cause Plaintiff to suffer severe emotional distress or acted with a reckless disregard of the probability that such distress would result from its conduct.

49. As a result of Defendant's conduct, as alleged herein, Plaintiff suffered severe emotional distress.

WHEREFORE, Plaintiff prays for relief as follows:

1. Compensatory damages of $132,956.60, for past and future disability benefits, plus interest at 10% on past due benefits.

2. Compensatory damages for emotional distress of $5,000,000.00, or according to proof.

3. Compensatory damages for the value of reasonable attorney's fees incurred obtaining the benefits of The Policy, according to proof.

4. Punitive damages in an amount sufficient to punish and make an example of Defendant.

5. Triple punitive damages pursuant to California Civil Code section 3345.

6. Costs incurred prosecuting this action.

7. Such other and further relief as this Court deems just and proper.

ERISA LAW GROUP, LLP

Date: October 22, 2013

*/s/  Robert J. Rosati*
ROBERT J. ROSATI, No. 112006

Attorneys for Plaintiff,
DEBBIE WELHOELTER

**REQUEST FOR TRIAL BY JURY**

Plaintiff hereby requests trial by jury in this action of all claims for relief properly triable by a jury.

ERISA LAW GROUP, LLP

Date: October 25, 2013

/s/   Robert J. Rosati
ROBERT J. ROSATI, No. 112006

Attorneys for Plaintiff,
DEBBIE WELHOELTER